The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Good morning and welcome to the Fourth Circuit. We're going to hear argument on our first case, Belmoral LLC et als versus Bayer Consumer Care et al. Before we get started, since we have so many lawyers and we have a cross-claim today, let me run through the order of presentation to make sure everybody's on the same page. So Ms. Eckhoff on behalf of Bayer will be first for 10 minutes, followed by Mr. Yellen for the government for five minutes on the trademark issue, and then Mr. McMull and Mr. Coleman have seven minutes each on behalf of Belmoral. You can divide that how you want, but you're allocated seven each, and then we go back to Ms. Eckhoff who has five minutes of rebuttal, and then Mr. McMull and Mr. Coleman have three minutes each, which you can divide among yourselves as you want, and you'll be responding to Bayer's response to your cross-appeal. So let's see if we can remember all that. This is the first case of a fairly long docket today, so the court may have questions. If we do, we'll give you a little extra time, but otherwise we'll be watching the clock. So with all that said, Ms. Eckhoff, if you want to begin. Thank you, Your Honor. May it please the court. This is a case about Belmora's ongoing efforts to deceive the American people about the source of the medicine they take. The decision for this court is whether to allow that misrepresentation to continue indefinitely, or whether to give Bayer the chance to prove its in connection with the number one brand of pain reliever there. Bayer's Flannex trademark is extremely well known. At the trademark trial, an appeal board held that that mark's reputation does not stop at the Mexican border. Just to help things along, the panel is going to be fairly familiar with the factual background. We've had parts of this case before, and since you have a number of issues, you may want to get directly to your legal arguments. Yes, Your Honor. So as you mentioned, Bayer presented a number of arguments in its brief, but since time here today is short, I'd like to focus on two. The first being that the district court erred by holding on summary judgment that Bayer's claims are barred by a statute of limitations, and the second, that Bayer's claims are not barred by latches. So I'll start with the example does not include a statute of limitations, and the district court erred by reading one in. The parties here agree that Ninth Circuit law governs the question of whether a statute of limitations should apply to Bayer's Lanham Act claims, and the Ninth Circuit's most recent decision on that. Well, the parties may agree with that, but we make our own decision on which law to use. But Bayer's argument, and we believe that Belmore agrees, is that because Bayer initially filed its Lanham Act claims in California district court, that Ninth Circuit and Central District of California law apply to that question under 1404. Well, ma'am, if we agree that latches is, you're entitled to that, do we have to remand that back to the district court for fact-finding? With respect to the latches question specifically? Right, yes. Well, I think you likely would, your honor, because the district court, as of now, the district court disposed of all of Bayer's claims under a statute of limitations. So I think a remand likely would be necessary. The district court did not make a finding at all with respect to latches. It didn't reach that issue. So with regard to the Lanham Act claims, if you're correct, we would remand for the district court to consider in the first instance. Right, yes. Correct. On the question of latches. Yes, your honor. Yes, that's a great idea. Well, Justice Ginsburg, not to belabor the point, would have disagreed with you on whether, on which circuit's law would apply, whether it's the transferee or the transferor's argument. It may not make a difference in this case, but we do have, I believe, one fourth circuit case, Bradley versus the U.S. from 1998, that holds that we cannot and do not apply the law of another circuit simply because the case was transferred from the other circuit. Well, so we may be bound by that. May not make a difference in the end, but... Sorry, your honor. Go ahead. No, go ahead. So our view on that point is that the courts don't have a uniform view as to whether a statute of limitations should be applied to Lanham Act claims. There's some inconsistency across the That's why we believe that Ninth Circuit law should govern instead of Fourth Circuit law. We do, on the other hand, think that... Counsel, Judge Thacker has a question. Oh, yes. But what if we find that Fourth Circuit law applies? Where does that leave you? So under Fourth Circuit case law, a majority of Fourth Circuit panels, to look at the question, have applied latches on the question of what sort of timeliness bar should be used for Lanham Act claims. So we still believe that latches would not bar any of Bayer's claims under the Fourth Circuit. And what's your best evidence that Bayer was not sleeping on its rights? It took years to file this claim. Well, our best evidence there, your honor, is that Bayer acted quickly in filing the petition to cancel, which it did in 2007. The shortest potentially applicable state law limitations period is three years for the false advertising claims and four years for unfair competition claims. The earliest that Bayer possibly could have even had constructive notice of its claims was September of 2004. That's when its predecessor had their own Flannex application suspended by the trademark office due to Belmore's prior Flannex application. So that was September of 2004. In fact, Bayer didn't even acquire rights in the Flannex mark from that predecessor until 2005. But even if we use the September of 2004 date, Bayer filed its petition to cancel in June of 2007, so less than three years later. Combining that, the fact that with the trademark trial and appeal board instead of district court makes sense because the trademark trial and appeal board has a lot of expertise in the issues of trademarks and trademark registration specifically. So Bayer wanted to take advantage of that expertise in getting a decision on the question. Additionally, all of the cases that have looked at this issue have found that board related claims. And so Bayer relied on those decisions as well in making its choice to move with the board instead of going straight to federal court. Let me ask you this question that as to your state law claims, how do they survive under a theory of equitable tolling or what? Yes, your honor. Under California state equitable tolling, Bayer meets the three factors there. We believe that those claims are also barred or are also told by the filing of the cancellation petition because they're part of Bayer's federal complaint. Same result as if we apply the four circuit law? Yes, your honor. Okay. So as I understand it, the district court simply ruled that the statute of limitations under California law had expired and it never dealt with equitable tolling or any other defense as to the statute of limitations. That's right, your honor. Yes, that is correct. The district court did not reach the latches issue and did not reach tolling either. Doesn't discuss either tolling or latches at all in the decision. Well, as far as the state claims are concerned, it would just be a question of tolling, wouldn't it? Yes, yes. And did you raise that in the district court? The tolling issue? Yes. Yes, yes. Our argument was that tolling applied to all of Bayer's claims. So if we agree that that was an issue raised and the district court never addressed it, wouldn't we just remand it to the district court to address it again in the first instance? Well, respectfully, your honor, we think that you could decide simply to reverse the district court's decision in finding that Bayer's claims were barred by the statute of limitations. And here the review is de novo of the summary judgment decision. Well, if it never made any, if the statute of limitations applies, but tolling may toll it, that would, I think, involve some factual determinations that have yet to be made. So we couldn't make those in the first instance, could we? That's, yes, your honor, that's probably correct. It would make sense to remand. All right. You've got 30 seconds left. What else have you got for us? All right. Let's see. So back to the statute of limitations issue briefly, your honor. Like I said, our view is that the Ninth Circuit law applies to that question. Pinkett is the most recent decision on point there. Pinkett applies latches instead of the statute of limitations, which we think is what the district court should have done in this case as well. And I see my time is now up. Okay. And I take it the government is going to carry the ball on the court? You're not arguing that specifically? We're prepared to discuss that, your honor, if you have any questions. But yes, because that's the bulk of the government's argument. We thought that we would leave it to them to focus on. All right. Thank you. You've got time left on rebuttal. Mr. Yellen, on behalf of the government. Good morning, your honors, and may it please the court. Louis Yellen on behalf of the United States. Your honors, we're here for two purposes. The first is to defend the district court's choice in employing a standard of view under which it reviews for substantial evidence, factual findings made by the board for which no new evidence was introduced in the district court action below. And second, to defend the board's decision to cancel the registration of Belmora's trademark because Belmora attempted to pass off its goods as those of Bayer's. On the first issue, the standard of review, the federal circuit for decades had employed a standard of review under which if no new evidence was introduced as to one particular factual issue, the district courts would defer to the factual findings of the board unless there was no substantial evidence to support those findings. Let me ask you this question. Are we quibbling over the term new evidence or additional evidence? Because it seemed to me that there was additional evidence that was submitted to the district court. And wouldn't that be new evidence? Judge Floyd, the question is new evidence as to what? Belmora's position as we understand it is if a party introduces new evidence as to any particular factual issue, that opens up the entire record for de novo review. That's not consistent with the federal circuit's precedent in this area. The question is under the federal circuit, if there's a dispute as to one particular factual issue and new evidence is introduced that's related to that particular factual issue, then the district court engages in de novo review of that factual issue, but not the entire record. And if I might, Judge Floyd, I can give you an example that might make this a little bit more concrete. Before you, counsel, before you give your example, let me read you one section out of Capos, which says that we conclude that the proper means for the district court to accord respect to the decisions of the agency is through the court's broad discretion over the weight to be given to evidence newly induced in the proceedings and the evidence that was taken below. So in the course of your example, see if you could address that language from the Capos decision, which seems to indicate that it's up to the district court when there is new evidence to accord weight to that evidence as well as what transpired in the agency. I'll be happy to, Your Honor. So in the federal circuit's doctrine and in the government's view, there are two buckets. One bucket is factual issues for which no new evidence is introduced, and the second bucket is factual issues for which new evidence is introduced. Let's take as the example a challenge to genericness and a challenge to confusion. If a party introduces evidence as to confusion but not to genericness, there is no call for a district court to engage in de novo review of the factual findings the board made as to genericness. But if new evidence is introduced as to confusion, then the board would undertake de novo review. Now, Judge Agee, the language that you just quoted refers to what the court should do when we're already in the second bucket. That is, when the court already must undertake de novo review because it has before it new evidence that the board had not considered. It was in that context, Your Honor, that the Supreme Court said, well, that doesn't mean that a court gives no consideration to the factual findings that the board made. When we're in that second bucket and a district court is engaging in de novo review, it nevertheless can decide what weight to give that new evidence. But nothing in the Capos decision suggested that the new evidence as to one issue would open up the entire record. And if I could point, Your Honors, to a particular quote, I think, Your Honors, if you look at every time the Supreme Court announces its holding, it's very careful to limit it to new evidence as to a particular factual issue. And this is one sentence, just one sentence that I'll read. At 566 U.S. 434, the Supreme Court said, we hold that the district court must make a de novo finding when new evidence is presented on a disputed question of fact. The court didn't say when new evidence is introduced into the record. It specified that it's the disputed question of fact that triggers new de novo review. And that's consistent with the Federal Circuit's longstanding precedent. If the Supreme Court had intended to upend that precedent, we would have expected a much more specific explanation that the court intended for district courts to You're over time, but I do want to ask you one more question with that in mind, because here's what we said in Swatch following the Capos decision. Where new evidence is submitted, de novo review of the entire record is required because the district court cannot meaningly defer to the factual findings if the agency considered a different set of facts. That's a little different than the Supreme Court's language in Capos. So if you can very quickly respond to that. Yes, Your Honor, I'll try and do so in a couple of sentences. We agree that that Swatch is at least ambiguous as to this point, but we think the best reading is to understand Swatch as not foreclosing substantial evidence review on questions of fact for which there is no new evidence. And what I would point Your Honors to is the second part of the sentence that you just read. That is, because the district court cannot meaningfully defer to the PTO's factual findings if the PTO considered a different set of facts. That refers to a particular factual dispute. If there's a factual dispute that the PTO had all of the evidence before it, there's no reason for a district court to open the entire record as to that particular factual dispute. And one last sentence on this, if I may, Your Honors. If you look at the particular issues that this court reviewed in the Swatch case, you'll see that what the district court did in that case that was erroneous was try to engage in substantial evidence review and de novo review as to the exact same factual issues. So for example, whether the mark was suggestive or descriptive, the district court said it was. Thank you, Mr. Yellen. Thank you, Your Honors. Unless the members of the panel have another question of you, we're going to move on to Mr. McMull. We'll be glad to hear from you. Good morning, Your Honors, and may it please the court. I'm Joel McMull for Balmora LLC and Jamie Belcastro. I'm joined this morning by my co-counsel, Ron Coleman. Again, I'd like to reserve three of my 10 minutes for rebuttal. Your Honors, while substantial aspects of the district court's summary judgment opinion were unprecedented and wrong, the dismissal of Behr's five unfair competition claims were not among them, as each were clearly barred by the applicable limitations period under California law. There are no material disputed facts regarding Behr's improper delay, and the district court followed well-reasoned California law in finding that Behr's filing of this action missed the limitations period by almost a decade. Behr appears to argue that because the courts of the Ninth Circuit interpreting California law have found that the Lanham Act contains no statute of limitation, that's the end of the inquiry. But of course, it is not, Your Honors, because in so stating, Behr ignores that California courts borrow the limitations period of the most analogous state law, which under California law is either three or four years, depending upon whether a state claim for fraud or an analogous four-year claim, or sorry, I'm sorry, unless an analogous unfair competition claim, which has a period of four years. The point here is... What happens if we disagree as to the Lanham Act claims that a statute of limitations applies and that latches would apply instead? I would submit to you, Your Honor, that the result is exactly the same. Of course, the district court below never reached that issue, but for all of essentially the same reasons, for latches to... It is essentially the same. The period, I believe, under Virginia law... Counsel, hold up a second. Judge Thacker has a question. Thank you, Judge Agee. So if the district court never reached the issue of latches, I go back to Judge Agee's question earlier of opposing counsel. Don't we send it back for the district court to do that, assuming we disagree with you on the statute of limitations? I don't think there's any need to, Your Honor. I think the record is sufficient to demonstrate that under Virginia law, which I believe has a six-year period, even if Virginia law applies, I still think it's untimely. And there are facts. Indeed, Your Honor, I encourage the court to take a look at page 16 of our opening brief, at which point we set out no less than interest were put on actual or constructive notice of Belmore's interest and use of the Flannick's trademark. But did the district court consider that in the context of latches? It did not, Your Honor. It did not. Okay. So why shouldn't we remand then for the district court to do that in the first instance, again, assuming we disagree with you on statute of limitations? Because I would submit to you that the record is sufficient, as presented, for your honors to make a determination that notwithstanding the fact that the district court didn't reach the issue, there is no material issue of fact to be determined. And that's based on the listing that you referenced in your brief? That's right. Because whether it's analyzed under a latches or a statute of limitations defense, I would submit that the outcome is exactly the same. Okay. I don't know whether you're going to be arguing about your competition counterclaims, but what evidence in the record is that you can point to that Baird knew or had reason to know that some third party was selling Mexican Flannicks in the United States? Well, Your Honor, again, my co-counsel, Mr. Coleman will be arguing those issues, but I will just say one thing to that, which is that in its pleading, in its pleading in the district court action, it acknowledges that it was aware of illegal Mexican Flannick sales in the United States. Now, I believe there is some deposition testimony that goes to that issue as well. But again, I'm going to leave that for my colleague, Mr. Coleman, if I may. Fair enough. Who's going to raise an argument about the trademark board decision? I am, Your Honor. The 14-3 misrepresentation claims, Your Honor, we've had a nice scholarly debate this morning on the applicable standard to be applied. And while we submit that this court, not the least of which is the District of Columbia, we believe that it really is an immaterial distinction. Because the board's findings were so tied and tethered to the notion of bad faith, the evidence that was submitted on remand goes to the very issue of Belmore's bad faith, namely the absence of bad faith, because Mr. Belcastro obtained approximately contemporaneous with seeking registration of his Flannick's mark the advice of counsel. And on remand, we submitted that in two instances, Your Honor. The first was in deposition testimony, which of course is included in the record, in which Behr's counsel asked him what were the circumstances under which you obtained that. And the second is that there is a document. And while I acknowledge that it may just be a pottery shard, it at least contributes or corroborates, rather, Mr. Belmore's testimony that back in 2003, he obtained the advice of counsel, which indicated that in the absence of Behr using the mark in the United States, and because at least before this court's prior ruling on appeal, we understood or our client understood trademark rights to be tied to territorial rights, he received the recommendation from his counsel that he could proceed with that registration. All right. So my point, in sum, Your Honors, my point is, is whether regardless of whether we look at the entire record, or we only look at what was ultimately produced as new evidence before the district court, it's an immaterial distinction, because when we recognize and we look at what that evidence is, it essentially undercuts the board's determination, or at least sufficiently so, so that it's a question of fact that should go to trial. Well, if we did find this, the standard of review was relevant, and the district court got a little off base on that, in the Swatts decision, we also found that the district court got off base, but it made sufficient findings that we could affirm the decision. And in this case, I'm looking at page 897 of the joint appendix, the district court appears to make several findings on that page with respect to its review of the new evidence. Would there be a barrier for us affirming the district court as we did in Swatts on that basis? Well, yes, in a couple of different ways. For one thing, Your Honor, the opinion also states, and forgive me, I have not had the occasion to read that paragraph, but the district court's opinion also indicated that Mr. Belcastro's testimony was not credible. Well, of course, credibility determinations are not appropriately made on summary judgment. And so, notwithstanding the court's characterization of the evidence, I would submit that it really exceeded what it was able to determine on a summary judgment motion. So in that respect, Your Honors, yes, I would argue that there is a barrier for Your Honors to affirm the court's summary judgment decision in favor of Behr on the misrepresentation claim that was decided by the board. All right. Thank you, Mr. McMull. Thank you. Mr. Coleman? Hold up. We can't hear you, Mr. Coleman. Unmuted. If Mike Dean's listening, can he fix that? No, we're good, Your Honor. Thank you. I muted myself to avoid any interruptions. If it pleases the court, thank you very much. I am here to discuss the counterclaims issue, the cross-appeal, essentially. Our fundamental interest here is obviously with all the counterclaims, but with the antitrust claim in particular, I would like to open my argument with the court below did not reckon with the record. We have an unusual situation here. Usually there's a debate regarding market- Hold up, Mr. Coleman. Your clock has not started. If the clerk will take a look at that and start the clock. All right. Let's give it a go. We have an unusual situation here with respect to market definition. Usually the issue of market definition is considered to be a threshold issue, and courts rely on expert opinion because it is a sophisticated and analytical and typically a matter for experts. And here we do have an expert. We have an expert who said that when you look at the actual relationships that exist between products in a market, the ability of one actor, in this case Bayer, to affect competition and see what happened in the Naproxen market, especially the Naproxen gel caps market, you have defined a market for that product, and you have also defined market power. What you also have here, which is extremely unusual, is essentially a commercial admission by Bayer in the form of both testimony and documents, where it analyzes for its own commercial purposes the market for Naproxen sodium entirely in the context of what are other market entrants, including Belmora, doing to alleve. There's no consideration of what is Excedrin doing, or what is Advil doing, or what are other products doing. Were you talking about Dr. Rosser as the expert? Yes, Your Honor. Okay, where in the record did Dr. Rosser speak to the relevant market here? I read his testimony as speaking more to the ECF numbering, or page 18 of the additional document number. So that's our excerpt from Dr. Rosser's testimony. Okay, well that's what I was referring to. It seems to me to speak more generally. Well, he does speak generally in his testimony, but in his report he details, and that can be found, Your Honor, in the Joint Appendix Volume 3, beginning at, well his report begins at JA 1103, but I would direct Your Honor's attention to JA 1108, where he discusses precisely what happened in the gel caps market, and also how a single product, and in this case Naproxen, can be separated and identified as a sub-market by virtue of its properties as a pharmaceutical, by virtue of how it's marketed, by virtue of who buys it. For all those reasons, at the very least, we're talking about a summary judgment here, Your Honor. To say that at the very least, questioned material fact was not raised, or to say that as a matter of law, no jury can find that a error. Now, if I may, because the court did ask the question about the issue of the secondary trademark liability, the record, as Mr. McMullin pointed out, does indicate that they are in its own pleadings, adverted to the fact that it was that its own sales, not actually of its own sales, those of a non-party here, which is its Mexican affiliate, were being affected by the defendant's conduct. We would also point out that willful blindness does not require actual knowledge of the sales, but rather of a condition which should cause reasonable inquiry. We put before the court in the briefing and in the appendix testimony and documentation concerning a news report of Mexican Flanax that had been found by a reporter in the United States, and what deposition testimony indicated was that Bayer didn't follow up on it, Bayer did not do an investigation about it, Bayer had no, had no, and as far as the record goes, still has no procedure or process for monitoring whether Mexican Flanax is sold in the United States, considering that it's against the law for it to do so. That would constitute at least a reasonable question going to willful blindness under the secondary trademark. Well, I mean, other than this example from that one TV report, and I thought they had contacted the reporter and asked him to send them the box and that sort of stuff, how does that create a cause of action for your client? Because my client has the trademark for Flanax, and if our client, if Bayer is selling Mexican Flanax in the United States, then Flanax, then Balmora, which is... Yeah, but what's your evidence of that, though? I don't recall any evidence in the record that tied Bayer to sales in the United States. If sales are taking place in the, well, but your honor, you just recited that evidence. The fact that Bayer was not aware that its product was being sold, certainly the court would not suggest that if shiploads, truckloads of Mexican Bayer showed up, Mexican Flanax showed up, and were being unloaded in El Paso, and Bayer said, well, listen, we're not selling it, it's not our problem, that that would... Well, do you have any evidence of that? Well, your honor, the only difference between the evidence you recited and the hypothetical that I just gave is the volume. We have evidence that Bayer is aware, and the fact that it pleaded that its affiliate sells, is aware of sales of its product in the United States, that's a trademark infringement. If Bayer is the proper party here to make a claim, it's certainly very much a proper party here to be responsible for the sales, which it claims were cut into by the conduct of VAXLAW. All right, what else you got, Mr. Coleman? Well, your honor, I think, I mean, given that I'm out of time, those were the main points we had. The trial court's role here was not to weigh evidence. We believe that sufficient questions, especially on the antitrust question, were raised to go to trial on the antitrust issue, as well as the tortious interference claim. All right, thank you very much. Ms. Eckhoff, you've got some rebuttal time. Thank you, your honor. First, I'd like to briefly address the alleged new evidence that Mr. McMull mentioned, what he referred to as a pottery shard. So this is what they claim to be a 2003 trademark clearance opinion letter. However, there's no credibility assessment that the district court made about that letter. It simply found that there isn't any reason to believe that the letter exists. It's not in evidence here. It's never been produced. The law firm that allegedly wrote it, Jacobson-Holman, they were never subpoenaed for a copy of the letter. And more specifically, in 2009, Mr. Belcastro, Balmora's founder, was deposed and was specifically asked whether any attorneys were involved in his adoption of the Flannex trademark in the United States. And he answered unambiguously, no, sir. So the claim now that there is no evidence that the letter exists, it's not in evidence. So I'm going to move on to the second part of my testimony. Let's see. With respect to the antitrust claim and Dr. Rausser, I would direct the court to page 48 of Bayer's response brief where we address Dr. Rausser's testimony. Here in the Fourth Circuit, the Fourth Circuit does require expert testimony to define the relevant market for an antitrust claim. And here, Dr. Rausser was asked, quote, in your August report, do you identify the relevant market that Bayer has allegedly monopolized or threatened to monopolize? Answer, no. Question, did you regard that as part of your assignment? Answer, no. So unambiguously here, we do not have any expert testimony defining the relevant market. That is a decisive issue on the antitrust claim. With respect to the alleged commercial admission by Bayer about what the market is for its Aleve product and whether or not there is a defined market or sub market for branded naproxen sodium liquid gels, as Belmora claims, this alleged commercial admission is an internal marketing PowerPoint that was created by a Bayer salesperson dealing with a small amount of sales that Bayer's Aleve was losing at Walmart because of the introduction of Belmora's Flanax there. There's plenty of case law in the Fourth Circuit that says that internal marketing documents do not constitute the type of because that definition is very complex. It's something that is reserved for experts, which is why the Fourth Circuit requires expert testimony. And the fact that business people, marketing people use the word market is different than the way an expert economist uses the word market when they're talking about antitrust. So that PowerPoint is certainly not an admission by Bayer about what the market might be. With respect to the 2008 news report, Judge Floyd, you are correct. There is evidence in the record that Bayer's global HR director, who was informed about this news report, immediately responded to the reporter and asked the reporter where they found this Flanax and also asked that the box be sent to Bayer so that they could look into the matter. This was back in 2008. There's no evidence that Bayer didn't take any further action with respect to that. Additionally, with respect to your question about whether there are truckloads of Mexican Flanax being brought in across the border, the answer is no. And more importantly, there is no evidence whatsoever that Bayer had anything to with Mexican Flanax crossing the border. In fact, Belmora itself used to make that argument. When this case was back before the trademark trial and appeal board, Belmora argued that just because there were a few isolated instances of Mexican Flanax found here in the United States, that was not evidence that Bayer had anything to do with it. There is no evidence in the record that Bayer has sold Mexican Flanax here, nor would it because the dosage in Mexico is higher than the dosage that's permitted here by the FDA. So Bayer's not going to sell it. There's also no evidence that Bayer knew about any particular importers or sellers of Flanax here and either induced those parties into acting or supplied them with Mexican Flanax. There's no evidence of either of those things. And let's see, I think that's the end of my time. All right. Thank you, Ms. Eckhoff. Mr. McMull, you've got three minutes. Thank you, Your Honor. Thank you, Your Honor. I do want to raise the issue of latches if I can. I know that we previously spent some time on that. Latches is a valid defense where a plaintiff's delay in bringing suit is both unreasonable and would cause prejudice to the defendant. I would submit to you that the record is extremely fulsome on both of these issues. Reasonableness is determined by looking at the state's limitation period. And Ninth Circuit law makes very clear that if the filing of a claim is filed after the limitations period, then there is a strong presumption that latches applies. With respect to in this case, Mr. Belcastro and Belmora LLC for 10 years were certainly enjoying revenues and putting money into their company in the millions of dollars they came to rely on, and I think rightfully so, the acquiescence of Bayer in claiming that it had a problem with respect to purported infringement claim or injunctive relief. The other prejudice that I think is very clear from the record that Belmora has sustained is that which relates to evidentiary prejudice. In this case, memories have faded, Your Honors. We're talking about events that happened 15 years ago. Certain witnesses are no longer available. Certain documents are no longer available, not the least of which, of course, is this 2003 opinion letter that regrettably has not been able to be discovered, in part because Mr. Belmora's former trademark counsel, among other things, had a security breach of their law firm and their data that precluded the production of the document. And while I appreciate that's not in the record, there is certainly prejudice here from a documentary and testimony perspective that Belmora has suffered. The additional prejudice from an evidentiary perspective is that because certain email communications, and there was a migration of email systems, that has resulted in the loss of documentation. So my point, Your Honor, is that there has been some serious prejudice that Belmora has suffered arising from the protracted delay that Bayer engaged in before filing suit in 2014. Okay. Thank you, Mr. McMullin. Mr. Coleman? Mr. Coleman, I think you're muted again. I'm just too good for my own sake here to well behave. So, Your Honor, I would like to just go back to this issue of expert testimony. Going again back to the reply brief where Dr. Rouser says, at the bottom of page 18, it's not that the scope of the relevant market is not important or can be swept under the rug. Instead, it's a question of whether there is a market linkage that allows the market position of one supplier to the market to actually abuse their position. And if they can, there's got to be some market where they exercise that power. And as in my Exhibit 1, the market where they can exercise that power is upstream with regard to the manufacturing of the Aleve product, the liquid gel product in particular. The District Court didn't wrestle with that testimony at all. And that was the error here. Merely relying on the quotation by Bayer of a gotcha question at a deposition is not good enough. Dr. Rouser's testimony, it makes it clear that Bayer had, and the facts make it clear, that Bayer had a complete veto over the market for inputs, the sale of raw naproxen liquid gels to any branded competitor. If that's not the definition of anti-competitive behavior, it's hard to imagine what is. You have a competitor who wants to go and who wants to compete with yours. You pick up the phone or the phone rings and someone says, listen, I want to sell the raw material to your competitor. Is that okay? And the competitor says, who's the competitor? Oh, Belmora? No, it's not okay. Shut him down. How is that not an attempt to monopolize if it's not monopoly? It's impossible to conceive of a more straightforward, transparent example of anti-competitive behavior. All right. Unless the panel has any further questions of counsel, we thank you all for your arguments today. If you've argued in the Fourth Circuit before, we would come down and shake hands, but we can't do that now, so consider this your virtual handshake, and we look forward to seeing you when we can be together in person. So with that, the Court will take a short recess, pending the setup for our next case. Thank you very much. Thank you, Your Honors. This Honorable Court will take a brief recess.
judges: G. Steven Agee, Henry F. Floyd, Stephanie D. Thacker